OFFICE OF THE ATTORNEY GENERAL
DOUGLAS MOYLAN, Attorney General of Guam
Graham Botha, Deputy Attorney General
590 South Marine Corps Drive
ITC Building, Suite 802
Tamuning, Guam 96913
Telephone: (671) 475-3324
Facsimile: (671) 472-2493
gbotha@oagguam.org

Bill Jackson*
John D.S. Gilmour*
Lauren H. Shah*
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Telephone: (713) 355-5000
Facsimile: (713) 355-5001
bjackson@kelleydrye.com
jgilmour@kelleydrye.com
lshah@kelleydrye.com

*Attorneys for the Government of Guam*
* Pro Hac Vice Forthcoming

## THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **GOVERNMENT OF GUAM,** | ) CIVIL CASE NO. |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **COMPLAINT WITH JURY** |
| | ) **DEMAND** |
| **BLACK CONSTRUCTION CORPORATION; BROWN & CALDWELL; GEO-LOGIC ASSOCIATES f/k/a VECTOR ENGINEERING, INC. f/k/a AUSENCO VECTOR; and GHD, INC. f/k/a WINZLER & KELLY** | ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) ) |

Plaintiff the Government of Guam ("Guam") files this Complaint against Defendants Black Construction Corporation; Brown & Caldwell; Geo-Logic Associates, Inc.; and GHD, Inc. f/k/a Winzler & Kelley, for causes of action arising from Defendants' faulty design and construction of a closure remedy of the Ordot Dump.

## INTRODUCTION

1.     In 2008, largely due to a political environment that delayed or prevented Guam from committing time and attention to the funding and effort required to close the Ordot Dump, this Court appointed Gershman, Brickner & Bratton, Inc. ("GBB") to stand in Guam's shoes, meet the terms of the 2004 Clean Water Act Consent Decree with the United States, and close the Ordot Dump. The primary goal of the closure was to stop leachate generated at the dump from entering the Lonfit River and polluting waters of the United States. Consent Decree, ECF 55 ("Consent Decree").[1]

2.     While the Ordot Dump stopped accepting waste in 2011, and closure construction was completed in 2016, the amount of leachate generated has not declined as expected for a closed landfill, even an unlined one. *See* Geosyntec, *Final Report: Investigation of Leachate Flow* (2024) (attached as Exhibit A) at § 3.3. The anomaly is due to faulty closure design and construction. *Id.* §§ 2.1, 3.4, 5. Until the error in the Ordot Dump's design and construction is corrected, surface water and groundwater from areas outside the dump will continue to infiltrate through the ground, mingle with the waste and existing leachate, and contribute to the leachate volume, significantly increasing disposal costs ultimately borne by the public. Ex. A at § 2.2; Sixth Joint Report at 4-5, ECF 2001. Guam and its taxpayers should not be paying to treat this excess leachate.

---

[1] Unless otherwise noted, Electronic Case Filing (ECF) Numbers are citations to the docket in *United States v. Gov't of Guam*, No. Civ. 02-00022 (D. Guam Aug. 7, 2002), a matter currently pending in the District Court of Guam before Judge Frances M. Tydingco-Gatewood.

1

3.     Contractors including Black Construction Corporation, Brown & Caldwell, Geo-Logic Associates, Inc., and GHD, Inc., were hired to develop, implement, and oversee the closure design and construction. Certain aspects of the closure are operating as expected, but the ability of water to infiltrate the dump's leachate collection systems reflects significant errors. Ex. A at § 5.

4.     Guam and its taxpayers have been damaged because the construction of the closure of the Ordot Dump followed a faulty design, and changes made during construction exacerbated the impact of the original design errors. *Id.* §§ 2.1, 5. These errors have interfered with the dump's final closure, delayed termination of the receivership, and added significant cost for Guam's taxpayers and ratepayers. Between the closure construction's completion in 2016 and the approval of the treatment rate change in 2023, Guam's taxpayers and ratepayers have been paying $27.42 per 1,000 gallons to treat water that should have never entered the dump or the dump's leachate collection system. Petition to Create New and Specific Rate Classification for Wastewater Discharge for Leachate, GWA Docket No. 23-08 at 4, 8-9, ECF 1996-1. Since the 2023 leachate treatment rate change, Guam's taxpayers have still been paying $14.72 per 1,000 gallons to treat this excess water entering the dump. *Id.* at 6. According to Guam's experts, the treatment of leachate that would not have existed had the Ordot Dump's closure been properly designed amounts to Guam's taxpayers and ratepayers writing a $3.72 million check to date. Ex. A at §§ 3.4, 5. These additional costs will continue in perpetuity unless remedied.

5.     Geo-Logic & Associates, Inc. ("Geo-Logic"), under the direction of Brown & Caldwell and GBB, designed a system to collect and carry leachate from the dump to holding tanks located downhill, at the south side of the Ordot Dump. Errors in the design and construction concentrated on the western side of the dump have allowed infiltration from both groundwater and surface water, such as rain, and caused an increased volume of leachate. *Id.* § 2.1.

2

6.      Geo-Logic's design had multiple errors. First, Geo-Logic decided to locate a leachate collection trench ("WLIT") in a streambed. The streambed's topography was problematic because it was located at the water table; *i.e.*, the bottom of the streambed abutted groundwater.[2] Further, the surrounding land was naturally graded to drain into the stream.[3] Finally, the waste at Ordot on the western side of the landfill juts out, making little space between the mountain of waste and what became—by design—the relocated stream. In short, Geo-Logic designed the relocation of the naturally occurring stream that ran along Ordot's western side farther west and at a higher elevation than it existed naturally. However, water still flowed toward the historic stream bed and newly installed WLIT.

7.      Second, Geo-Logic designed the WLIT such that it was located beneath another leachate-carrying trench, the Perimeter Leachate Collection Trench ("PLCT"). The WLIT's location directly below the PLCT means that leachate in the PLCT will enter the WLIT in the case of any cracks or breaks in the surface of the PLCT, which one would expect to see if the PLCT were not properly maintained. *Id.* § 2.1(1).

8.      Third, in addition to design errors approved at the start of the closure project, Brown & Caldwell, Geo-Logic, and GHD ("Closure Contractors") made design changes in the field during the construction that have allowed further infiltration of groundwater and surface water from areas outside the dump into the leachate collection system. During construction, the Closure Contractors sought approval from GBB to change the design that originally called for a non-porous

---

[2] Brown & Caldwell Project Team, *Design Report: Ordot Dump Closure Construction* at 26-27 (Permitting Copy Mar. 2013) [hereinafter *2013 Design Report*].

[3] Brown & Caldwell, *Conceptual Site Model Update II: Ordot Dump Post-Closure Facility* at 2–8 (Oct. 2021) [hereinafter *2021 Conceptual Site Model II*].

liner wrapped around three sides of the WLIT.[4] Despite data demonstrating that the bedrock surrounding the WLIT was very permeable and would allow water to flow through it,[5] GBB approved the change and the liner was not used at all. The WLIT was placed directly into bedrock that had the permeability of sand. *Id.* § 2.1(2).

9.  Fourth, during construction, the Closure Contractors changed the design for the fill used around, atop, and uphill of the WLIT from compact materials to highly permeable sands, corals, and gravels. *Id.* § 2.1(4). Thus, the fill material used allows surface water and groundwater to infiltrate the WLIT, flow into the leachate tanks, and be sent for treatment along with the leachate. *Id.*

10.  When Guam received GBB's $56 million future cost estimate, there was cause for alarm. Rather than accept this as Guam's burden and destiny, Guam has since that time pushed for answers.

11.  In response to GBB's astronomical future costs estimate, this Court ordered GBB to conduct an investigation of the rising leachate levels at the Ordot Dump. Order Re: Next Steps Post-Hearing 1, ECF 1952. GBB thereafter tasked Brown & Caldwell to investigate its *own* work. Not surprisingly, Brown & Caldwell's investigation has pointed to all the wrong places, failed to report what the evidence shows and, most recently, placed blame on a third party for a leak occurring *outside* the landfill. The truth, however, is that off-site water leaks would have minimal impact on the leachate levels at the Ordot Dump had its closure been properly designed and constructed. Ex. A at § 5. Indeed, Brown & Caldwell's investigation was flawed from the outset,

---

[4]  GHD Project Team, *Final Construction Quality Assurance Report: Ordot Dump Closure Construction and Dero Road Sewer Improvements* at 14 (Feb. 2016) [hereinafter *Final CQA Report*].

[5]  *2013 Design Report* at App. D.

as it only looked for a single, contemporaneous source of increased leachate and did not evaluate whether errors were made in the original design or in design changes made during construction.

12. Therefore, Guam has conducted its own investigation and has come to the conclusion that certain of GBB's contractors failed in the design and construction of the Ordot Dump and are liable to Guam in several respects. Guam's expert report concludes that the Closure Contractors should not have located WLIT in the very porous bedrock, very near the groundwater table, and directly below the PLCT. *Id.* §§ 2.1, 5(2). During construction, the Closure Contractors should not have removed the originally-designed geomembrane lining of the WLIT. *Id.* § 2.1(2). Further, the areas surrounding the WLIT and areas uphill of the trench should not have been filled with material that is highly permeable and allows surface water and groundwater to infiltrate the trench, travel to the leachate storage tanks, and ultimately be treated along with the leachate dewatering from the waste mass. *Id.* § 2.1(4).

13. Guam has suffered damages for years. Guam's taxpayers have paid significantly for remedial measures such as excess leachate treatment from the leachate storage tanks, tanker trucks brought on site to collect leachate from the overflowing secondary containment system.

14. Guam's experts have uncovered the design decisions, made before and during construction, that led to the errors and determined a remedy to fix the errors. Guam brings this lawsuit for damages and injunctive relief. While once Guam stood in a position unable to timely close the dump, Guam now seeks to act quickly to remediate the long-standing issue of excess and improper leachate generation at the Ordot Dump.

15. Guam deserves to have the Ordot Dump remediated so that it is properly closed as it should have been in the first instance. Guam deserves to be compensated, with interest, for the

money spent paying to treat excess and improper leachate and investigate the Construction Contractor's errors.

## PARTIES

16.     Plaintiff, the Government of Guam, brings this action in its own name, pursuant to 48 U.S.C. § 1421a. Guam is represented by and through the Attorney General of the Territory of Guam with principal offices at 590 S. Marine Corps Drive, ITC Building, Ste. 902, Tamuning, Guam 96913. *See* 48 U.S.C. § 1421g(d)(1). The Attorney General is authorized to "conduct on behalf of the government of Guam the prosecution of all offenses against the laws of Guam" and "represent[] the citizens as a whole for redress of grievances which the citizen individuals cannot achieve." *See* 5 G.C.A. §§ 30103, 30109(a).

17.     Defendant, Black Construction Corporation ("Black Construction"), is a corporation organized and existing pursuant to the laws of the Territory of Guam, with its principal place of business located in the Harmon Industrial Park, J. L. Baker St, Tamuning, Guam 96913. Black Construction is a subsidiary of Tutor Perini Corporation, organized pursuant to the laws of the State of Massachusetts, with its principal place of business located at 15901 Olden Street, Sylmar, CA 91342.

18.     Defendant, Brown & Caldwell ("Brown & Caldwell"), is a corporation organized and existing pursuant to the laws of the State of California, with its principal place of business located at 201 N. Civic Dr., Suite 115, Walnut Creek, California 94596.

19.     Defendant, Geo-Logic Associates, Inc. (f/k/a Vector Engineering, Inc.; f/k/a Ausenco Vector) ("Geo-Logic"), is a corporation organized and existing pursuant to the laws of the State of California, with its principal place of business located at 2777 East Guasti Road, Suite 1, Ontario, California 91761.

20.     Defendant, GHD, Inc. (f/k/a Winzler & Kelley) ("GHD") is a corporation organized and existing pursuant to the laws of the State of California, with its principal place of business located at 4747 N. 22nd Street, Suite 200, Phoenix, AZ 85016.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (civil action arising pursuant to the laws of the United States), 28 U.S.C. § 1367(a) (same case or controversy pursuant to Article III of the United States Constitution), 42 U.S.C. §§ 9613(b) and 9613(g)(2)(B), 48 U.S.C. §§ 1424(b) and 1424(c), and *United States. v. Gov't of Guam* No. Civ. 02-00022, (D. Guam Mar. 17, 2008), Order Re: Appointment of Receiver at 19, ECF No. 239 ("Appointment Order"), *order clarified*, No. CV 02-00022, (D. Guam Jan. 27, 2017), ECF 1712 (continuing jurisdiction to enforce provisions of its Order).

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2) and 1391(e)(1)(B) and 42 U.S.C. § 9613(b) because all claims arise in Guam.

## FACTUAL ALLEGATIONS

### A.  Site Background

23.     The Ordot Dump is a closed dump site and municipal solid waste disposal facility approximately 43.5 acres in area, situated in the middle of the Island of Guam, 2.5 miles south of Hagåtña. Ordot Dump sits directly north of the Lonfit River, a tributary of the Pago River, which drains into the Pacific Ocean at Pago Bay.

24.     Historically, the land on which the Ordot Dump sits was a natural depression in a basin located between two ridges—essentially, a ravine bounded by the Lonfit River to the south.

7

Such topography is lost on modern maps. Today, the Ordot Dump is a mountain of waste reaching 230 feet above mean sea level.

25.     The Ordot Dump has a long history of operational and environmental problems. The United States Navy established the Ordot Dump before World War II and used it as a disposal site for military refuse from the wartime years, including munitions, unexploded ordnance, and toxic military waste. Later, the Ordot Dump became the only municipal solid waste disposal facility on island.

26.     Until its closure, the Ordot Dump operated as an unlined and uncapped dump, allowing rain and surface water to percolate through and carry hazardous substances and other contaminants into the groundwater and the Lonfit River. When water mixes with landfill waste, it becomes leachate. Leachate released from the Ordot Dump ultimately entered Pago Bay and the Pacific Ocean, into which the Lonfit River and its tributaries empty.

## B.  The Clean Water Act Litigation and Consent Decree

27.     At Guam's request, the United States Environmental Protection Agency ("USEPA") declared Ordot a Superfund site in 1983, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601-9675.

28.     Although the Superfund designation provided USEPA with the ability to use federal funding to clean up the site, the United States chose not to do so. Instead, the United States issued a series of unilateral administrative orders pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251-1389, directing Guam to fund and remediate Ordot without federal aid.

29.     Guam was unable to comply with USEPA's orders. Consequently, the United States sued Guam pursuant to the CWA in 2002, alleging that Guam was allowing the discharge

8

of leachate from Ordot into the Lonfit River and two of its tributaries. Complaint for Injunctive Relief and Civil Penalties, ECF 1.

30. In 2004, after two years of litigation, the parties entered into a comprehensive Consent Decree with the approval of this Court. *See* Consent Decree.

31. The Consent Decree required Guam to, among other things, close the Ordot Dump and stop the discharge of leachate. To fully close the Ordot Dump, the Consent Decree directed Guam to complete certain remedial actions: (1) design, construct, and install a cap over Ordot; and (2) design, construct, and install a surface water diversion system. *Id.* In order to monitor the progress of the closure, the Consent Decree also required Guam to submit written quarterly reports. *Id.*

32. By 2008, despite its best efforts, Guam remained unable to comply with the terms of the Consent Decree. Guam's solid waste system was plagued by lack of coordinated governmental support, experienced personnel, and dedicated funding. Accordingly, this Court appointed a federal receiver to effectuate the terms of the Consent Decree, including the closure of the Ordot Dump. *See* Appointment Order.

**C. The Federal Receivership**

33. On March 17, 2008, this Court appointed GBB as receiver, and charged it with the duty to "protect[] the natural resources [of Guam] for future generations" by "ensur[ing] compliance with the Consent Decree and the Clean Water Act." Appointment Order at 19. To fulfill its duties, the Court gave GBB "full power and authority to enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste Management Division of the Department of Public Works [of Guam]." *Id.* at 15. The Court specifically authorized GBB to, among other things: "enter . . . into future contracts deemed

9

necessary," "hir[e] . . . consultants, professionals, contractors, engineering firms or counsel," and "facilitat[e] the financing and/or borrowing of such funds necessary to carry out the duties relating to the Consent Decree." *Id.* at 16-17.

34.     As a court-appointed receiver, GBB owes a duty to this Court to properly execute its duties, keep the Court fully informed of its actions in effectuating the terms of the Consent Decree, and obey the Court's orders. GBB owes Guam a fiduciary duty to manage and operate the Ordot Dump properly, effectively, efficiently, and without causing further harm.

35.     On April 29, 2019, the Court partially terminated the Receivership. *See* Order Re: Partial End of Receivership, ECF 1880. However, GBB remains obligated by Court Order to "oversee and control all work associated with the post-closure of the Ordot Dump." *Id.* at 2. The Receivership is ongoing and will remain in place "for the period necessary to achieve compliance with the Consent Decree." Appointing Order at 17.

### D. **The Closure of the Ordot Dump**

36.     The Ordot Dump officially stopped accepting waste on August 31, 2011, pursuant to an order from GBB issued in anticipation of the dump's closure. To carry out the closure, GBB, signing for Guam, entered contracts with various engineers and design and construction companies to complete the work required pursuant to the Consent Decree, which took place in the 2014 and 2015 dry seasons. The Ordot Dump was finally closed in 2016.

### 1.     **Roles of the Defendants**

37.     Black Construction is a construction company with experience in civil engineering. On December 6, 2013, GBB, signing for Guam, contracted with Black Construction to construct the closure at the Ordot Dump and make improvements to the sewer system along Dero Road (the

"Black Construction Contract"). Pursuant to the Black Construction Contract, Guam would pay over $40.5 million to Black Construction for its services.

38. Black Construction agreed to indemnify both Guam and GBB for any and all costs arising from its negligent and willful acts, including "destruction or damage to any property" and "contamination of or adverse effects on the government." Black Construction further agreed to pay Guam and GBB reasonable attorneys' fees incurred from Black Construction's conduct.

39. Brown & Caldwell is an environmental consulting, engineering, construction, and operations company that contracted with the former Solid Waste Management Division of the Department of Public Works, through GBB, on May 20, 2011, to assist with the closure of Ordot Dump (the "Brown & Caldwell Closure Contract"). Pursuant to the Brown & Caldwell Closure Contract, Guam would pay Brown & Caldwell nearly $6.2 million for its services.

40. Brown & Caldwell agreed to be responsible for the "professional and technical accuracy of all work" and "without additional cost to the Government, correct or revise all errors or deficiencies in [its] work." Pursuant to the contract, Guam reserved all rights and causes of action arising from Brown & Caldwell's failure to perform per the contract, notwithstanding Guam's review, approval, and acceptance of Brown & Caldwell's work. Brown & Caldwell further agreed that it was "liable to the Government for negligent performance of any of the services performed" pursuant to the Brown & Caldwell Closure Contract.

41. The Brown & Caldwell Closure Contract also contains indemnification provisions that inure to the benefit of Guam. Brown & Caldwell agreed to hold both Guam and GBB harmless for any and all costs arising from Brown & Caldwell's negligent and willful acts, including "destruction or damage to any property" and "contamination of or adverse effects on the

government." Brown & Caldwell further agreed to pay Guam and GBB reasonable attorneys' fees incurred from Brown & Caldwell's conduct.

42.     Brown & Caldwell served as the engineer on record for the closure of the Ordot Dump and is the prime consultant responsible for the design of the Ordot Dump's closure system. Brown & Caldwell additionally provided construction quality assurances for the closure of the Ordot Dump. In May 2018, Brown & Caldwell entered a separate contract with GBB, signing for Guam, to act as operator of the Ordot Dump. Brown & Caldwell remains the current "Operator" of the Ordot Dump.

43.     Brown & Caldwell hired GHD, a global multi-disciplinary professional services firm, in 2011 as a subcontractor. GHD contracted with GBB in December 2013 for construction management services on the Consent Decree projects (the "GHD Contract"). Pursuant to the GHD Contract, Guam would pay GHD nearly $6.5 million for its services.

44.     GHD agreed to be responsible for the "professional and technical accuracy of all work" and "without additional cost to the Government, correct or revise all errors or deficiencies in [its] work." Pursuant to the contract, Guam reserved all rights and causes of action arising from GHD's failure to perform per the contract, notwithstanding Guam's review, approval, and acceptance of GHD's work. GHD further agreed that it was "liable to the Government for negligent performance of any of the services performed" pursuant to the GHD Contract. The GHD Contract also contains indemnification provisions that inure to the benefit of Guam. GHD agreed to hold both Guam and GBB harmless for any and all costs arising from GHD's negligent and willful acts, including "destruction or damage to any property" and "contamination of or adverse effects on the government." GHD further agreed to pay Guam and GBB reasonable attorneys' fees incurred from GHD's conduct.

12

45.     Geo-Logic, an environmental and geotechnical engineering firm, contracted with Brown & Caldwell in 2011 to serve as the construction manager subconsultant to GBB, charged with completing a geotechnical analysis and final cover system design. Geo-Logic provided construction management and construction quality assurance for the capping system drainage and environmental control construction for the closure of the Ordot Dump, and assisted with preparing the closure and post closure plans. Pursuant to the contract, Guam would pay Geo-Logic $600,000.

46.     In 2016, GHD and Geo-Logic (as GHD's subcontractor) were tasked with performing additional closure construction management and construction quality assurance services at the Ordot Dump. Following the completion of closure construction, GHD and Geo-Logic began providing additional post-closure support. For these additional services, GHD charged roughly $360,000, and Geo-Logic charged over $1.3 million.

47.     Brown & Caldwell, GHD and Geo-Logic all understood, or should have understood, that their contracts were with Guam and for the benefit Guam.

**2.      The Closure Contractors Designed the Ordot Dump's Closure and Developed Closure and Post-Closure Plans**

48.     Pursuant to the Consent Decree, USEPA Regulations, and Guam's Rules and Regulations, the Closure Contractors prepared closure and post-closure care plans "describing the steps necessary to close" the Ordot Dump. *See* 40 C.F.R. § 258.60; GAR Title 22, Division 4, Ch. 23 § 23601. To assist it with completing these duties, GBB employed a number of contractors.

49.     To develop the *Final Closure Plan: Ordot Dump Closure Construction* ("Closure Plan"),[6] Brown & Caldwell created work plans for topographic surveys, geotechnical investigations, delineation of waste limits, leachate generation potential, jurisdictional wetland

---

[6] Brown & Caldwell Project Team, *Final Closure Plan: Ordot Dump Closure Construction* (Permitting Copy Mar. 2013) [hereinafter *2013 Closure Plan*].

13

delineation, and hydrogeological investigations. Brown & Caldwell employed subcontractors to conduct the hydrogeological and geotechnical studies; Geo-Logic and GHD provided design and construction quality assurance services.

50.     The Closure Contractors required assistance with conducting hydrogeologic and topographical studies and employed three additional companies: (1) Marianas Drilling constructed and installed groundwater monitoring wells and landfill gas collection trenches; (2) APTIM/Shaw Environmental completed an interim slope stability analysis of the Ordot Dump and produced a revised topographic map; and (3) ARC Environmental obtained requisite permits to access wetlands, evaluated how the closure of Ordot would alter leachate flow to the nearby low-laying wetlands, created a wetlands delineation map, and assisted in preparing the stormwater pollution prevention plan.

51.     The Closure Contractors completed the Closure Plan in March 2013, and GBB subsequently submitted it to USEPA and the Guam Environmental Protection Agency ("GEPA").[7] GEPA provided comments and conditionally approved the 100% Design Submittal for the closure in 2013. GEPA conditioned its approval on, among other things, the submission of an Environmental Protection Plan describing the methods and procedures used to protect Guam's natural resources.

52.     As designed, the closure of Ordot would include, in part, an engineered cover system, a leachate collection and removal system, and a surface water diversion system.

53.     For the engineered cover system, the Closure Plan presents cover designs, with the design that was chosen consisting of the following layers from top to bottom: (1) an erosion layer consisting of geocell with crushed coral stone infill; (2) a geocomposite drainage layer; (3) a

---

[7] *Id.*; *see also* ECF 1067-1 at 4.

geomembrane barrier/infiltration layer; (4) a geocomposite landfill gas/leachate interception layer; and (5) a crushed coral foundation layer. GEPA and USEPA approved GBB's use of an alternative cover after GBB presented them with a Hydrologic Evaluation of Landfill Performance ("HELP") model to demonstrate that the cover system that was chosen would provide equivalent protection from water infiltration and erosion.[8]

54.     The HELP model, created by Geo-Logic, additionally provided an estimate of the leachate that would be generated at Ordot following its closure. *The HELP model projected that, once closed, Ordot would generate* "**[a] peak daily discharge of 48,700 gallons** [of leachate,] and an average annual discharge of 1,310,400 gallons" of leachate.[9]  Based on this information, the Closure Contractors designed the onsite leachate management system, comprised of a geocomposite drain, perimeter collection trench, and two leachate interceptor trenches. The leachate interceptor trenches were designed to "collect leachate that is seeping out at the base of the Dump along the western and southeastern sides of the site."[10] The trenches were designed to then convey leachate by gravity piping to the leachate storage tanks.[11]

55.     The Closure Contractors' reports represented that a surface water diversion system would capture run-off and preclude stormwater from mingling with leachate-contaminated groundwater. The design of the surface water diversion system anticipated that run-off would flow down the installed cap, collect in concrete-lined ditches, pass through perimeter channels, and discharge into four stormwater detention ponds.

---

[8] *2013 Design Report* at App. S.
[9] *2013 Design Report* at 77 (emphasis added).
[10] *2013 Closure Plan* at 36.
[11] *Id.*

15

56. The Closure Plan also states that the Ordot Dump would be closed in accordance with applicable permits, the Consent Decree, and applicable USEPA and GEPA regulations.[12]

57. The *Post-Closure Care Plan for Ordot Dump Post-Closure Facility* ("Post Closure Care Plan"), prepared primarily by Brown & Caldwell, contains instructions on developing annual post-closure care cost estimates and financial assurance. It also describes how GSWA and Guam should monitor and inspect the Ordot Dump during the 30-year post-closure period set forth in the Consent Decree.[13]

58. In the Post-Closure Care Plan, the Closure Contractors expressly warranted that the "closure corrective measures, principally [the] installation of a geosynthetic cap and drainage improvements, will reduce leachate generation rates by 98 to 99%, and ***will reduce contaminated stormwater discharges by 100%***."[14]

**3. The Closure Contractors Designed and Constructed the Ordot Dump's Closure**

59. Brown & Caldwell, with support from Geo-Logic and GHD, managed construction, which Black Construction primarily performed.

60. Brown & Caldwell, Black Construction, GHD, and Geo-Logic began constructing the final cap system in December 2013.

61. GHD served as the Construction Manager, designed the stormwater ponds and leachate storage systems for the closure of the Ordot Dump, and provided construction quality assurance services.

---

[12] *Id.* at 3.

[13] Brown & Caldwell, *Post-Closure Care Plan for Ordot Dump Post-Closure Facility*, (Oct. 2021) [hereinafter *Post-Closure Care Plan*].

[14] Brown & Caldwell, *Compensatory Mitigation Plan – Ordot Dump Site*, (July 2013) at 3-2 (emphasis added).

62.     Black Construction was the general contractor in charge of construction.

63.     Geo-Logic, under contract with GHD, oversaw the earthwork, geosynthetics works, concrete work, and capping system drainage and environmental control construction.

64.     Constructing and installing cover systems for dump sites or landfills generally reduces the volume of leachate by preventing the percolation of rainwater through the waste mass. *See* Ex. A at § 1.4(2). However, the leachate at the Ordot Dump has increased to volumes over five times those measured prior to the completion of closure construction in 2016.

65.     Brown & Caldwell, Black Construction, GHD, Geo-Logic, and their subcontractors were responsible for all aspects of the design, construction, installation, and other activity concerning the cover system.

66.     The Closure Contractors additionally designed a surface water diversion system wherein run-off would flow down the installed cap, collect in concrete-lined ditches, pass through perimeter channels, and discharge into four unlined stormwater detention ponds.

67.     Brown & Caldwell, Black Construction, GHD, Geo-Logic, and their subcontractors were responsible for all aspects of the design, construction, installation, and other activity concerning the surface water diversion system.

68.     In addition to constructing the cap, Defendants also designed, constructed and installed a leachate collection and removal system ("LCRS") to collect leachate generated as the waste mass at the Ordot Dump dewatered so that it could be transported to, and treated at, the Hagåtña wastewater treatment plant.

69.     The LCRS is comprised of three bolted steel storage tanks manufactured by Fusion Tanks and Silos and installed by Shearer and Associates, both subcontractors hired by Black Construction. The tanks each hold approximately 16,000 gallons, measure 25.2 feet in diameter,

and contain regular and emergency equipment including liquid level controls for leachate pumps, liquid level gauges, floor sumps, access hatches and ports, and wall connections to drains, pipes, and secondary containment for leachate overflow.

70. The rest of the LCRS consists of the PLCT, the WLIT, a duplex pumping system with controls, and a force-main that discharges into Guam Waterworks Authority's ("GWA") sewer through a flow meter. The PLCT and WLIT collect leachate generated at the Ordot Dump and deliver the leachate to the storage tanks, where the leachate is eventually discharged into the GWA sewer.

71. The cap and LCRS are the primary remedial components intended to reduce the volume of leachate, contain it, control its migration, and prevent its release. GBB, Brown & Caldwell, GHD, and Geo-Logic submitted reports assuring Guam and this Court that their work would reduce the volume of leachate and prevent the discharge of leachate from the Ordot Dump. Unfortunately, Defendants' negligent design, construction, and installation of the LCRS has increased the volume of leachate, as well as Guam's costs of disposing of the leachate, and continues to contribute to the contamination of the Lonfit River and its tributaries via seeps and containment overflows. Ex. A at §§ 1.3, 3.2, 4.1.

**4.      Brown & Caldwell is Hired as the Operator of the Ordot Dump**

72. In May 2018, GBB, signing for Guam, contracted with Brown & Caldwell to operate the Ordot Dump (the "Brown & Caldwell Operator Contract").[15] Pursuant to the Brown & Caldwell Operator Contract, Brown & Caldwell would receive a minimum of $6.5 million to

---

[15] Agreement to Operate the Ordot Facility By and Between Gershman, Brickner & Bratton, Inc., in its Capacity as Receiver for the Guam Solid Waste Authority, Government of Guam, as Owner, and Brown and Caldwell Constructors, as Operator (May 2018).

18

operate Ordot Dump over an initial period of 7 years: 2018 through 2025.[16] As of January, 2024, Guam's estimated payment to Brown & Caldwell for the initial contract period has risen to $7.6 million.[17]

73. Under the Brown & Caldwell Operator Contract, Brown & Caldwell agreed to be solely responsible for "all costs" associated with operating the Ordot Dump, as well as fines attributable from its own negligence.[18]

74. Brown & Caldwell further agreed to assume operation of the LCRS. Brown & Caldwell agreed to minimize the production of leachate, monitor the facility for leachate leaks, and take "immediate action" to control and remediate any leachate leaks.[19]

**E. The Effects of the Design and Construction Defects**

**1. Leachate Discharge at the Ordot Dump has Worsened Since the Closure Plan Was Completed**

75. Based on Defendants' representations, had the engineered cover system, LCRS, and stormwater management system been designed and constructed with proper care, there would be a decline in leachate generated at Ordot since its closure. *See* Ex. A at § 3.3 (Figure 6). The graph above shows the vast discrepancy between the expected decreasing trend in leachate flow versus the actual increasing monthly leachate flow at the Ordot Dump from 2015 to 2024.

---

[16] *Id.* §§ 2.01, 3.01.

[17] Gershman, Brickner & Bratton, "Revised Special Report of the Receiver to the Board of Directors of the Government of Guam, Guam Solid Waste Authority" at 4 (Oct. 23, 2023, *rev.* Jan. 16, 2024) [hereinafter "Revised Special Report of Receiver"].

[18] Brown & Caldwell Operator Contract at § 5.05(A).

[19] *Id.* § 5.05(F).

19



76.     As stated in the Third Joint Report Regarding Receiver's Remaining Work and the Financing Plan, the quantity of leachate generated at the Ordot Dump quadrupled between 2015 and 2022, from 615,000 gallons per month between November 2015 and October 2016, to 2,656,000 gallons per month between May 2021 and April 2022. *See* Third Joint Report Regarding Receiver's Remaining Work and the Financing Plan, 3, ECF 1948. The average quantity of leachate produced at Ordot peaked between January 2022 and December 2022, at approximately 3,380,000 gallons per month. Ex. A at App. A.

77.     Previously, GBB asserted that "[p]rojected peak daily flows after closure are 50,000 gpd, with a much lower long-term average flow projected at 3,600 gpd." Quarterly Report of the Receiver, ECF 1067-6. This initial estimate, which should be the maximum average daily flow at a closed landfill (*i.e.*, it should decrease over time), was already in excess of the design maximum of 48,700 gpd. ***Since 2015, the average flow rate of leachate for the LCRS has exceeded its***

***design maximum of 48,700 gpd more than 80% of the time and continues to exceed it to this
day.*** Indeed, the amount of leachate has been high enough to exceed the design capacity of the
LCRS, enter the emergency secondary containment area, and necessitate the use of trucks to collect
leachate for transport to the wastewater treatment plant. Third Joint Report Regarding Receiver's
Remaining Work and the Financing Plan at 5, ECF 1948. Expensive emergency measures should
not be considered a part of the design capacity.

78. In contrast, Brown & Caldwell claims that the design capacity of the LCRS is
210,500 gallons per day ("gpd").[20] However, this number is incorrect because it includes both the
maximum storage tank capacity *and* the secondary containment storage capacity (*i.e.*, emergency
overflow containment).[21] It is not standard practice to include secondary containment in the total
design capacity of a leachate storage system. Ex. A at § 1.3. Moreover, exceeding daily average
flow capacity stresses the total design capacity and renders it inaccurate. *Id.* Thus, Brown &
Caldwell's analysis is wholly inconsistent with the facts on the ground at the Ordot Dump.

79. Since 2022, the volume of leachate has declined, averaging approximately
1,400,000 gallons per month in 2023, but it still regularly exceeds the average daily flow capacity,
and the total design capacity, of the LCRS and is increasing instead of decreasing overall. It is
anticipated that, absent a remedy, increased leachate flow will continue in perpetuity.

80. Flaws in the design, construction, installation, and/or operation of the WLIT and
the stormwater management system is responsible for the abnormal volume of leachate post-
closure.

---

[20] Brown & Caldwell, *LCRS As-Built Design Capacity Evaluation* at 2-2 (Oct. 2021).
[21] *Id.*

### i. Brown & Caldwell Failed to Identify Design and Construction Defects Associated with the WLIT

81. The WLIT has experienced "large fluctuations" in flow since it began operating in 2015, particularly during storm events.[22]

82. By 2017, the leachate flow increased enough to cause USEPA to request an analysis of the LCRS to determine the root cause of continued leachate discharge. *See* United States' Status Report at 2 (Feb. 22, 2019), ECF 1850. Brown & Caldwell was aware that the highest flow volumes were attributable to the WLIT, as flow rates as great as 72 gallons per minute had been measured by the interim operator since 2015.[23]

83. In a technical memorandum dated March 22, 2019, Brown & Caldwell admitted that such "large fluctuations cannot be explained by" the engineered cover system, which was designed to greatly diminish the volume of leachate after Ordot's closure.[24] Brown & Caldwell confirmed this in a March 2023 monitoring survey.[25]

84. In the 2019 technical memorandum, which was requested by and submitted to USEPA, Brown & Caldwell posited that "the flow in the WLIT may be explained by the introduction of clean water flow via ground water from areas north of the Ordot Closure Facility entering the WLIT."[26]

85. GBB again identified the WLIT as a source of the increase in August 2019, when it implemented an enhanced leachate monitoring program to evaluate the LCRS. The initial plan,

---

[22] Brown & Caldwell, Evaluation of Ordot Leachate Collection and Removal System at 5 (Technical Memorandum Mar. 22, 2019) [hereinafter 2019 LCRS TM].

[23] *Id.* at 1.

[24] *Id.* at 5.

[25] Brown & Caldwell, *Leachate Flow and Seep Investigation Update* (Technical Memorandum [No. 2] July 21, 2023) [hereinafter *July 2023 Update*].

[26] *2019 LCRS TM* at 5.

as ordered by USEPA, was to characterize the sources and volumes of leachate flow to the LCRS, with the WLIT being of primary concern.[27] Shortly after, however, Brown & Caldwell scrapped that plan, said the issue was not the WLIT, and decided to focus on the as-built capacity of the LCRS instead of the design calculations, the ability of the LCRS to handle storm events instead of increase in leachate volume, and the PLCT instead of the WLIT.[28] When Brown & Caldwell began collecting data for this leachate monitoring program, the annual leachate flow was at an all-time high, averaging approximately 1,850,000 gallons per month in 2019. Leachate flows averaged approximately 21,000 gpd in 2016 and 23,000 gpd in 2017 before jumping to 1,550,000 gpd in 2018. Yet Brown & Caldwell has never adequately investigated how and why groundwater and surface water can infiltrate the WLIT.

86.    By narrowing the evaluation to only storm events, Brown & Caldwell precluded the discovery of issues in the design and construction of the WLIT.

87.    Brown & Caldwell again identified the WLIT as a problem during a reconnaissance of Ordot performed in November 2022, after site personnel observed multiple groundwater seepages, including a major seep running approximately 35 feet along the western drainage channel.[29]

88.    The reconnaissance revealed that leachate flow from the WLIT between August and October 2022 represented 63–90% of total leachate flow at that time. Ex. A at §§ 3.1, 3.3.

---

[27] Brown & Caldwell, *LCRS As-Built Design Capacity Evaluation* at 1-1 (Oct. 2021).

[28] Brown & Caldwell, *November Site Reconnaissance Trip Report and Leachate Flow Study Update* (Technical Memorandum [No. 1] Feb. 4, 2023) [hereinafter *November Site Recon.*].

[29] *See November Site Recon.* at 9.

23

89.     Had the atypical leachate discharges from the WLIT been properly investigated and resolved closer to the date of closure, Guam could have avoided incurring costs of treating millions of gallons of leachate.

### ii. Due to the Design and Construction Defects Stormwater is Creating Increased Leachate Volumes

90.     Ordot's closure design included a management system intended to prevent all surface water, including stormwater, from mingling with leachate generated at the Ordot Dump. On January 28, 2013, GBB represented that, as designed, "stormwater is prevented from contact with the leachate by an impervious cover system and managed by a stormwater collection system on the Ordot Dump." *See* Letter Re: Confirmation of Acceptance of Leachate Wastewater Discharge from Ordot Dump at 2, ECF 1067-7.

91.     All of the drainage structures in the stormwater collection system are designed to collect the runoff from a 25-year, 24-hour storm event of 20 inches, to allow for a typhoon effect, and three out of four stormwater detainment ponds were designed to provide excess storage volume.[30]

92.     Had the surface water system been designed and constructed properly, it would preclude stormwater from mingling with leachate-contaminated groundwater.

93.     Defendants continued to take the position throughout 2023 that leachate generation bore no relationship to stormwater.

94.     Yet, data shows that leachate generated at the Ordot Dump generally increases in months with greater monthly precipitation and decreases when precipitation declines. Ex. A at §

---

[30] *See 2013 Design Report* at 60.

1.4. In other words, leachate volume is directly impacted by precipitation, something that should not happen at a properly closed landfill. *Id*.

95. In a technical memorandum dated July 21, 2023, Brown & Caldwell continued to assert that "a correlation between rainfall and the previously noted long-term increasing flow trends is not apparent at this time."[31]

96. The graph below, based on data provided to GSWA, depicts the actual relationship between monthly precipitation and average leachate flow.



97. During storm events, groundwater elevation measured at the Ordot Dump's groundwater monitoring wells and observed at the stormwater ponds also increases at a volume and rate that exceeds the closure design. Ex. A at App. A.

---

[31] *July 2023 Update* at 11.

98.     On October 23, 2023, in a special report to the GSWA Board of Directors, GBB conceded that stormwater was infiltrating leachate at the Dump. Although it had assured the General Manager of GWA that stormwater would be prevented from contact with leachate in 2013 (ECF 1067-7), GBB told GSWA in 2023:

> "[i]t is normal for groundwater levels to rise in response to precipitation events. The Dump is an unlined landfill with municipal solid waste materials resting on the bedrock surface. As the water table rises in response to precipitation, this groundwater potentially contacts the waste and leachate, picking up contaminants. The leachate collection trenches included in the design of the closure took this into account and were properly sized to collect this leachate. The design expected that leachate volumes would increase as a response to seasonal precipitation changes, and storm events, and would have to be collected and treated as leachate."

Notice of Filing of Special Report of the Receiver to the Board of the Guam Solid Waste Authority, 9, ECF 2009.

99.     Had Defendants built the system according to design specifications that prevented stormwater from coming into contact with leachate, there would be only a minimal observed relationship between leachate generation and precipitation and leachate volumes would be decreasing over time. Instead, increased leachate volumes from groundwater infiltrating the waste mass as well as clean groundwater from outside of the waste mass are infiltrating the WLIT in response to storm events.

100.     Following an inspection of the stormwater management system performed in March 2023, GSWA was told repeatedly that the Ordot Dump's remedy was sound. According to GBB, the inspection "did not identify cover system or stormwater management infrastructure integrity issues that would result in increases in infiltration and subsequent increases in flows

26

beyond the anticipated design flows. Therefore, further investigation of the cover system by such means as dye-tests or other methods is not warranted."[32]

101.    Further investigation *is* warranted. Fractures in the underlying bedrock may explain the influence of both stormwater and groundwater on leachate flow from the WLIT. The Closure Contractors and Black Construction constructed two stormwater ponds at the highest points of historic groundwater flow pathways through fractures in the underlying bedrock. The Closure Contractors and Black Construction were aware that fractures in the bedrock underlying the Dump were conduits for groundwater movement and that groundwater would be routed towards the southwestern border of the Dump, directly intersecting the WLIT and the Western Drainage Channel. The Closure Contractors knew that portions of the detention ponds may be constructed into the bedrock; Black Construction would have observed the fractures during construction.[33]

102.    Because Defendants failed to line the stormwater ponds, stormwater collected in those ponds percolates through bedrock fractures and intercepts the LCRS.

103.    Had the closure design adequately accounted for stormwater influence, the water level in the WLIT would not increase during storm events to the extent and speed that it does, mingling with leachate, and greatly amplifying the volume of leachate generated at the Ordot Dump.

---

[32] *July 2023 Update* at 4.
[33] *2013 Design Report* at 55.

### iii. Due to the Design and Construction Defects Leachate Overflows and Seeps Discharge to the Lonfit River

104.     Since the Ordot Dump's closure, there have been four documented releases of leachate into the Lonfit River and additional releases in the form of seeps of leachate percolating to the surface at the perimeter of the Ordot Dump.

105.     On September 13, 2017, a break in the pipe carrying leachate to the wastewater treatment plant caused the release of an estimated 6,000 gallons of leachate.[1] The pipe was repaired and no other corrective action was taken. Brown & Caldwell asserted that the release was not caused by any lack of the LCRS as-built design capacity. No reason for the pipe break was identified.

106.     On October 18, 2017, 7,300 gallons of leachate overflowed the top of the emergency secondary containment area during a period of heavy rainfall. Brown & Caldwell asserted that the overflow and release was caused by a power outage, not by any lack of the LCRS as-built design capacity.[1] However, the incident report labels the power outage a "secondary causal effect" and named "high inflows" into the PLCT and WLIT as a "primary causal effect."[1]

107.     On September 11, 2018, during Typhoon Manghut, a blockage in a pipe carrying leachate from the PLCT and WLIT caused an overflow at the WLIT of 40,000-50,000 gallons of leachate.[1] In 2021, Brown & Caldwell asserted that the release was not caused by LCRS design issues. *Id.* Yet, in 2023, GBB told GSWA that the system had been overwhelmed by the high flows from Typhoon Manghut, well beyond the design capacity of the system. Notice of Filing of Special Report of the Receiver to the Board of the Guam Solid Waste Authority at 6, ECF 2009. Had the LCRS been designed and constructed properly, stormwater would not have such an impact on leachate volumes. Ex. A at § 1.4.

28

108.    On May 24, 2023, during Typhoon Mawar, leachate pumps at the Ordot Dump stopped working, causing a release of up to 100,000 gallons of leachate.[1] According to GBB, pumps stopped working when power was lost at the dump.[1]

109.    Properly closed landfills typically do not experience sharp increases in leachate generation during heavy rain events. Ex. A at § 1.4. Parts of the Ordot Dump's closure were likewise designed to prevent infiltration of stormwater during heavy rain events. Brown & Caldwell designed and constructed a geomembrane cover to prevent rainwater from infiltrating the waste mass of the closed dump and a surface water diversion system to capture run-off from that cover. However, due to design and construction defects associated with the LCRS and WLIT, leachate generation skyrockets during the wet season and heavy rain events from stormwater and groundwater infiltration.

110.    Releases occur in the form of seeps at the Ordot Dump outside of heavy rain events. In November 2022, Brown & Caldwell began investing seeps observed at the dump. As set forth in Joint Status Reports and a Technical Memorandum prepared by Brown & Caldwell, three separate seeps at the Ordot Dump were observed that were likely resulting in releases to the Lonfit River:

      a.   "One seep was observed approximately 40-feet before the drainage discharged into the Lonfit River. This area showed signs of erosion and likely intercepted the groundwater table."[34]

      b.   "During reconnaissance of the pre-closure location of the Eastern-most Leachate Drainageway, stormwater discharge and groundwater from the subsurface water diversion trench near Stormwater Pond 4 was discharging at the Facility outfall, which generally follows the Eastern-most Leachate Drainageway. As a result, continuous water flow was observed at this location." *Id.*

      c.   "The re-emergence of groundwater seepage at the LEAS-2 location became evident after the 31-inches of rainfall during and after Typhoon Mawar. Following this precipitation event, the volume of groundwater seepage, though limited, observed

---

[34] *See November Site Recon.* at 8.

at LEAS-2 was sufficient to result in flow to the Lonfit River."[35]

111.    Samples of seeps collected near the western drainage channel in December 2022 were above background groundwater quality for six constituents: (1) alkalinity, (2) total dissolved solids, (3) total organic carbon, (4) iron, (5) chloride, and (6) ammonia.[36]

112.    Further, the leachate emanating from the Ordot Dump contains reportable levels of nearly 300 materials listed as toxic "hazardous waste" pursuant to section 3001 of the Solid Waste Disposal Act, 42 U.S. Code § 6921.[37] *See* 40 C.F.R. 261.30.

113.    Pursuant to the Brown & Caldwell Operator Contract, Brown & Caldwell is required to monitor the Ordot Dump for leachate leaks, take "immediate action" to control and remediate observed leaks, and take action to document and monitor seeps.[38]

**iv. Due to the Design and Construction Defects, Water Sources Beyond the Footprint of the Ordot Dump Impact Leachate Volume**

114.    GBB has blamed the anomalous leachate volumes at the Ordot Dump on a leak from a water pipe situated outside the facility along Dero Road. The leak was first identified and repaired in December 2022, coinciding with the onset of Guam's dry season.

115.    Immediately following the repair, leachate volumes generated at the Ordot Dump experienced a significant but temporary drop. Since its repair, leachate volumes have once again skyrocketed, more than quadrupling from the low in April 2023 and reaching a maximum volume that is twice the design capacity of the LCRS. Ex. A at § 1.4 (Figure 3).

---

[35] *See July 2023 Update* at 9.

[36] *Id.* at 10.

[37] *See* GBB, Semi-*Annual Groundwater Monitoring Data Through November 2023* (Feb. 28, 2024).

[38] *See* Brown & Caldwell Operator Contract at § 5.05(F).

116.    It is likely that water leaking from the pipe migrated via the fractures in the underlying bedrock and through the waste mass, and intermixed with leachate, stormwater, and groundwater, all of which was collected by the WLIT as leachate. The pipe leak alone, however, does not explain the anomalous volume of leachate observed at Ordot. Instead, the repair of the leak indicated that the Ordot Dump had been infiltrated by water outside the facility continuously since its closure and remains at risk to receive external sources of water infiltration, absent remedial measures. Ex. A at § 4. Water outside of a properly closed landfill should not infiltrate the facility. Indeed, data collected from 2023, after the leak had been repaired, demonstrates that other sources of groundwater, surface water and stormwater continue to infiltrate the WLIT and LCRS.

**2.    The Closure Contractors and Black Construction Concealed Problems with the Design and Construction of the Ordot Dump's Closure**

117.    The Closure Contractors and Black Construction began construction with a faulty understanding of the sub-surface conditions at the Ordot Dump. The Closure Contractors, Black Construction, and their subcontractors encountered conditions while onsite that indicated significant issues existed with the design and/or construction of the LCRS and WLIT in particular.

**i.    The Construction Contractors Located the WLIT in Permeable Bedrock, Contrary to the Design**

118.    Despite acknowledging and observing that groundwater moves quickly and easily in the surficial soil and saprolite layer found directly above the bedrock and in the fractured upper layer of the bedrock, the Closure Contractors proceeded as if the bedrock underlying the Ordot Dump would be nearly impervious with an average hydraulic conductivity of $1 \times 10^{-7}$

31

centimeters/second, and act as natural containment for leachate.[39] In reality, the soil underlying and surrounding the Ordot Dump is composed of highly porous bedrock, or very fine-grained volcanic sediment with high clay content. In fact, the bedrock at the site has an average hydraulic conductivity of $1 \times 10^{-3}$ centimeters/second—the hydraulic conductivity of sand (i.e., it is highly porous). Ex. A at § 2.1(2). Water can easily move through such a permeable material.

119.    Brown & Caldwell stated in February 2023 that a larger, more expansive fracture system may be providing direct groundwater connections beneath the Ordot Dump, leading to the increasing leachate volume in the WLIT.[40] However, Brown & Caldwell was aware of this possibility during construction, as it observed discrete bedrock fracture zones during construction of the LCRS.[41]

120.    The Closure Contractors, and Black Construction approved departures from the original LCRS design without sufficient evaluation or data. In one contract change order, for example, Black Construction requested major changes such as eliminating a low permeability channel from the construction plan because "in situ soils are impermeable enough" and eliminating the Eastern Leachate Interceptor Trench from the construction plan as unnecessary, on the grounds that all leachate would be contained in the PLCT.[42] Geo-Logic, GHD, Brown & Caldwell, and GBB approved the changes, with the reason for the change listed as a "[r]ecommendation of [GHD, Brown & Caldwell, Geo-Logic, and Black Construction] based on field conditions," without further explanation. *See* Quarterly Report of the Receiver, ECF 1675-9.

---

[39] *2013 Design Report* at 55.

[40] *November Site Recon.* at 7.

[41] *Id.*

[42] *See* Black Construction Company, *Change Order No. 02* (2014).

121.    In addition, the Closure Contractors and Black Construction, with GBB's approval, utilized a highly permeable fill material atop and surrounding the WLIT. This departed from the initial design, which called for compact fill that would have prevented surface water and groundwater infiltration into the WLIT. Instead, the fill that was used permits the free flow of water into the WLIT, and ultimately into the leachate tanks, particularly during storm events. Ex. A at § 2.1(4).

122.    Similarly, the Closure Contractors removed the geomembrane liner from the WLIT design without explanation. Like the geomembrane layer of the cap, this geomembrane liner would have served to make the WLIT far less susceptible to groundwater infiltration. *Id.* § 2.1(2). However, the as-built WLIT consists of a perforated pipe placed in a trench and wrapped in geocomposite filled with gravel. Asserting that the bedrock would be as effective as the geomembrane (an assertion that was false in light of the fact that the bedrock was as permeable as sand), Black Construction simply created a "natural containment channel" for the WLIT by cutting approximately two feet into bedrock. In essence, they created a preferred pathway for groundwater and surface water to the WLIT. *Id.* § 2.1.

123.    In March 2019, Brown & Caldwell noted that the groundwater monitoring well north of the WLIT contained groundwater at levels approximately 50 or 60 feet higher than parts of the WLIT. With the groundwater table high enough to immerse the perforated portion of the WLIT, groundwater entered the WLIT in significant volumes and mingled with leachate, greatly increasing its volume.

124.    Brown & Caldwell never raised these issues with the construction of the WLIT to the attention of the Court or Guam, and have not adequately investigated the likely impact of groundwater infiltration into the WLIT on leachate levels.

33

125.    Rather, Brown & Caldwell concluded that an initial evaluation of data collected through December 2020 demonstrated that the WLIT was not a major contributor to the total leachate flow in the LCRS and that "the monitored leachate flows were easily handled by the existing system." Brown & Caldwell's conclusion was in error.

**ii.Defendants' Relocation of the Stream was a Design Defect**

126.    The design of the LCRS also included the relocation of an approximately 510-foot section of a natural drainage channel along the western boundary of the Ordot Dump to allow for capping of the waste in the original location of the streambed. Black Construction contracted Western Stream Works as its specialty contractor to perform this work in 2014.

127.    Brown & Caldwell provided quality assurance for the western channel relocation. It therefore reviewed each Construction Drawing and Specification section with Western Stream Works and verified conformance to the design specifications.[43] However, Western Stream Works did not initially construct the relocated channel according to the Contract Documents, with discrepancies in alignment, depth, channel slope, bank slope, and material size and placement.

128.    The Closure Contractors and Black Construction allowed the location of the WLIT within a stream bed marked by a fractured bedrock system and very near the groundwater table, permitting vast quantities of groundwater to infiltrate the leachate collection and removal system.

129.    Typically, an unconfined groundwater table will mirror surface topography. Ex. A at § 2.1(3). When Western Stream Works relocated the western channel to a higher elevation and filled the old channel with soil, it raised the groundwater table in the vicinity of the WLIT such that the groundwater table intersects the ground surface at the elevation of the historic streambed— now the WLIT. This allows for significant groundwater inflow to the WLIT, particularly during

---

[43] *See Final CQA Report* at 12.

the wet season and storm events. *Id.* § 2.1(1). This is contrary to the design goal of preventing groundwater and surface water infiltration into the WLIT.

### iii. Brown & Caldwell Engages in Mere Cursory Investigations to Hide the Design and Construction Defects

130.    Brown & Caldwell admits that the WLIT was constructed despite data gaps for existing groundwater measurements and chemistry. It knew that these data gaps would prevent them from rigorously evaluating the potential impacts of leachate on groundwater near the Ordot Dump. As late as 2021, USEPA was meeting with Brown & Caldwell regarding its "fail[ure] to fully acknowledge the interconnection between site leachate and groundwater" at the Ordot Dump.[44]

131.    Not only did Defendants fail to acknowledge the true extent of the interconnection between leachate and surface water and groundwater at the Ordot Dump, USEPA concluded that "there was a large gap in downgradient coverage whereby contaminated groundwater could potentially migrate undetected."[45]

132.    The October 2023 Special Report to GSWA states that USEPA's concerns about the insufficiency of the closure design established for the LCRS have been addressed, stating: "USEPA's comments were addressed in a March 22, 2019, revised version of the LCRS Capacity Evaluation report in which the data gathered and evaluated to date indicated the facility design

---

[44] USEPA Letter to GEPA, "U.S. EPA Response to Draft 'Technical Memorandum: RCRA-Compliant Groundwater Monitoring Program' October 2021" at 3 (Nov. 5, 2021); GBB Letter to GEPA, "Ordot Dump Post-Closure Facility – US EPA Background and Summary Statements" at 2 (Dec. 16, 2021).

[45] USEPA Letter to GEPA, "U.S. EPA Response to Draft 'Technical Memorandum: RCRA-Compliant Groundwater Monitoring Program' October 2021" at 3 (Nov. 5, 2021).

35

capacity was adequate to manage the anticipated design flows, which included anticipated clean groundwater entering the system."[46]

133.    The Report does not mention USEPA's rejection of the March 2019 report or the agency's comment that it was "disappointed that despite [US]EPA's nearly two-year request for a root cause analysis and design evaluation, Brown and Caldwell's effort does not appear to be as robust as would have been expected."[47]

134.    Defendants are also misrepresenting the issues with regard to increased leachate generation and disposal. Brown & Caldwell repeats that the LCRS was designed and constructed to account for the infiltration of clean groundwater resting on top of the lower bedrock, and the LCRS may have the capacity to manage "anticipated design flows" including "anticipated clean groundwater entering the system."[48] But, in March 2019, Brown & Caldwell stated that the discharge from the WLIT was a result of an "**unanticipated** introduction of upgradient clean water flow."[49]

135.    The negligence of Defendants' actions in designing, constructing, and installing the LCRS is causing groundwater and surface water to compound the volume of leachate and dramatically increase the costs of the remedy at the Ordot Dump. Brown & Caldwell, Black Construction, GHD, Geo-Logic, and their subcontractors were responsible for the design, construction, installation, and other activity concerning the LCRS and are liable to Guam for their negligence.

---

[46] "Revised Special Report of Receiver" at 5.
[47] USEPA Letter to Brown & Caldwell, "Back Up Data Needs to be Provided" (Apr. 2, 2019).
[48] "Revised Special Report of Receiver" at 5.
[49] *2019 LCRS TM* at 6.

36

### iv. Guam Has Incurred Significant Costs Treating the Atypical Amounts of Leachate Generated at the Ordot Dump Due to the Design and Construction Defects

136.    Guam has spent $2.85 million in excess leachate treatment costs and an additional $870,000 to Brown & Caldwell between 2015 and 2023 due to the design and construction defects at the Ordot Dump. Ex. A at § 3.4. This represents a total estimated cost of $3.72 million in excess of expected operation costs. *Id.*

137.    On July 6, 2023, GWA filed a petition seeking the Public Utilities Commission's approval to create a new and specific rate classification for wastewater discharge for leachate ("leachate disposal rate"), reducing the currently applied disposal rate from $28.92 per 1,000 gallons (kgal), at GWA's present Commercial 3 facility rate, to a new, specific leachate disposal rate of $14.72 per kgal. *See* Petition to Create New and Specific Rate Classification for Wastewater Discharge for Leachate, GWA Docket No. 23-08, ECF 1996-1.

138.    The new leachate disposal rate was based largely on a 2021 cost of service analysis performed by Geo-Logic, acting as a subcontractor of Brown & Caldwell.

139.    In 2019, Brown & Caldwell acknowledged that "[d]ischarging the WLIT water to the GWA sewer is wasteful of sewerage capacity and quite expensive."[50] It proposed solutions such as monitoring constituents of interest to produce a reliable characterization of WLIT waters, routing the WLIT to clean stormwater Pond 2, and installing an upgradient groundwater barrier wall near the uphill end of the perforated pipe.

140.    Brown & Caldwell did not pursue any of the proposed solutions. Instead, it chose to stop investigating the WLIT, allow leachate volume to quadruple, and blame the exorbitant cost on GWA's leachate disposal rates.

---

[50] *Id.* at 6.

141.    When the Receivership ends, Guam will be burdened with paying the post-closure costs and all related contracts.

## CAUSES OF ACTION

### First Cause of Action

**Breach of Contract** (Brown & Caldwell, Black Construction, GHD)

142.    Guam restates and incorporates by reference herein the allegations set forth above.

143.    In May 2011, Guam, through GBB, entered into an enforceable contract with Brown & Caldwell, supported by consideration, to help achieve Guam's compliance with the Consent Decree.

144.    In October 2013, Guam, through GBB, entered into an enforceable contract with Black Construction, supported by consideration, to help achieve Guam's compliance with the Consent Decree.

145.    In November 2013, Guam, through GBB, entered into an enforceable contract with GHD, supported by consideration, to help achieve Guam's compliance with the Consent Decree.

146.    In May 2018, Guam, through GBB, entered into an enforceable contract with Brown & Caldwell, supported by consideration, providing for Brown & Caldwell's operation of Ordot Dump.

147.    Brown & Caldwell, Black Construction, and GHD have each breached their obligations to Guam under the Brown & Caldwell Closure Contract, Brown & Caldwell Operator Contract, Black Construction Contract, and GHD Contract (together, the "Ordot Contracts") by negligently designing, constructing, and managing construction of the closure of Ordot Dump.

148. Brown & Caldwell and GHD have further breached their obligations to perform professional and technically accurate work, and their covenants to correct and revise deficient work at no extra cost to Guam.

149. Brown & Caldwell's, Black Construction's, and GHD's breaches of contract are material.

150. As a direct and proximate result of Brown & Caldwell's, Black Construction's, and GHD's breaches, Guam has been damaged in an amount to be proved at trial, but in no event is less than $3.72 million. Ex. A at §§ 3.4, 5(5). Guam's damages include costs incurred in treating anomalous leachate generated at Ordot Dump, damage to property at Ordot Dump, ongoing contamination of the environment at and surrounding Ordot Dump, and future costs associated with repairing Brown & Caldwell, Black Construction, and GHD's deficient work.

151. Pursuant to the Ordot Contracts, Brown & Caldwell, Black Construction, and GHD are required to indemnify Guam for all liabilities, claims, penalties, forfeitures, suits, and costs and expenses (including costs of settlement and reasonable attorney's fees), arising from their negligent and willful conduct.

## Second Cause of Action

**Breach of Warranty** (Brown & Caldwell, Black Construction, GHD)

152. Guam restates and incorporates by reference herein the allegations set forth above.

153. Brown & Caldwell, Black Construction, and GHD warranted that they were capable of performing the closure remedy at Ordot to professional engineering standards and that CQA measures would eliminate any mistakes during design and construction.

39

154. Brown & Caldwell, Black Construction, and GHD's warranties that they would build a functioning closure remedy to professional standards was the basis of the agreements with them.

155. Brown & Caldwell, Black Construction, and GHD breached these warranties by failing to perform the work to professional standards.

156. Failing to satisfy the requirements of the Consent Decree after 15 years of Receivership is a breach of the promises and descriptions made by the Defendants about their services as well as a breach of the implied warranty of good faith and fair dealing.

157. As described above, Guam sustained and is continuing to sustain damages directly caused by Defendants' breach of warranties.

## Third Cause of Action

**Professional Negligence** (Brown & Caldwell, Black Construction, GHD, Geo-Logic)

158. Guam restates and incorporates by reference herein the allegations set forth above.

159. Brown & Caldwell, Black Construction, and GHD are in direct privity with Guam.

160. At relevant points in time, Guam was an intended beneficiary of the agreements between Brown & Caldwell, GHD, and Geo-Logic.

161. Brown & Caldwell, Black Construction, GHD, and Geo-Logic owed a duty to Guam to ensure that their work at Ordot Dump was performed with skill, prudence, and diligence.

162. Brown & Caldwell, Black Construction, GHD, and Geo-Logic designed, altered, and constructed the closure of Ordot imprudently and without due diligence.

163. Had Brown & Caldwell, Black Construction, GHD, and Geo-Logic skillfully, properly, and diligently designed, constructed, and installed all the components of the remedy, leachate volume would have decreased and the financial burden on Guam's agencies and taxpayers would have lessened.

164.     As a result of Brown & Caldwell's, Black Construction's, GHD's, and Geo-Logic's negligence, leachate volume has increased, as has the financial burden on Guam's agencies and taxpayers.

165.     As described above, Guam has sustained and is continuing to sustain damages directly caused by Brown & Caldwell's, Black Construction's, GHD's, and Geo-Logic's negligence.

**Fourth Cause of Action**

**Recovery of Response Costs Pursuant to Section 107(A) OF CERCLA, 42 U.S.C. § 9607(a)(4)(A)** (Brown & Caldwell)

166.     Guam restates and incorporates by reference herein the allegations set forth above.

167.     The Ordot Dump is located on Guam. The Ordot Dump is a "facility" as the term is used in § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and as defined in § 101(9) of CERCLA, 42 U.S.C. §9601(9).

168.     Brown & Caldwell is a "person" as the term is used in § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and as defined in § 101(21) of CERCLA, 42 U.S.C. §9601(21).

169.     Brown & Caldwell is responsible for operating and maintaining the Ordot Dump during the post-closure care period, pursuant to the "Agreement to Operate the Ordot Facility By and Between [GBB]., in its Capacity as Receiver for [GSWA], Government of Guam, as Owner, and Brown and Caldwell Constructors, as Operator," dated May 8, 2018.

170.     Brown & Caldwell is an "operator" of the Ordot Dump as defined in § 101(20) of CERCLA, 42 U.S.C. §9601(20).

171.     During the time Brown & Caldwell operated the Ordot Dump, "releases" or threatened releases of "hazardous substances" to the environment occurred at and onto the Ordot Dump and the Lonfit River within the meaning of §§ 101(14), 101(29) and 107(a) of CERCLA,

42 U.S.C. §§ 9601(14), 9601(29), 9607(a), and the Solid Waste Disposal Act, 42 U.S. Code §§ 6903(5) and 6921. *See also* 40 C.F.R. § 261.30. For instance, a release of up to 100,000 gallons of leachate occurred during a storm event in 2023.

172. Brown & Caldwell is a "response action contractor" pursuant to § 119(a) of CERCLA, 42 U.S.C. § 9619(a). A response action contractor is liable for a release caused by its negligence, gross negligence, or intentional misconduct. 42 U.S.C. § 9619(a)(2). Brown & Caldwell's professional negligence and negligent operation and maintenance of the Ordot Dump has caused or contributed to the continued releases of leachate.

173. Guam has incurred and will continue to incur necessary costs of response caused by the releases and threatened releases of hazardous substances at the Ordot Dump.

174. Guam's response actions regarding the Site are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

175. Pursuant to § 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), Defendant Brown & Caldwell is liable to Guam, in whole or in part, for cost recovery from any costs of response, including expert fees and attorneys' fees, incurred and that could be incurred in the future by Guam at Ordot Dump. *See Key Tronic Corp. v. U.S.*, 114 S. Ct. 1960 (1994).

176. Pursuant to Section 107(a) of CERLA, 42 U.S.C. § 9607(a), Defendant Brown & Caldwell is liable to Guam for environmental response costs incurred by Guam related to the Ordot Dump, plus interest, in an amount to be proven at trial.

## **Fifth Cause of Action**

**Declaratory Judgment of Liability for Future Response Costs Pursuant to Section 113(g)(2) OF CERCLA, 42 U.S.C. § 9613(g)(2)(B)** (Brown & Caldwell)

177. Guam restates and incorporates by reference herein the allegations set forth above.

42

178.    Guam will continue to incur costs associated with the Ordot Dump that are recoverable from Defendant Brown & Caldwell as response costs pursuant to CERCLA.

179.    Section 113(g)(2)(B) of CERCLA, 42 U.S.C. § 9613(g)(2)(B), specifies that, in any action for recovery of costs pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, "the court shall enter a declaratory judgment on liability for response costs . . . that will be binding on any subsequent action or actions to recover further response costs . . . ."

180.    Guam is entitled to entry of a declaratory judgment that Defendant Brown & Caldwell is liable for future response costs incurred by Guam in connection with the Ordot Dump to the extent that such costs are incurred in a manner not inconsistent with the National Contingency Plan.

## DEMAND FOR JURY TRIAL

181.    Guam demands a trial by jury for all issues so triable.

## CONCLUSION

**WHEREFORE**, Guam prays that this Court enter judgment against Defendants as follows:

182.    Enter a judgment in favor of Guam on all claims asserted against Defendants;

183.    Enter a judgment in favor of Guam and against Brown & Caldwell, Black Construction, and GHD that they breached obligations under their respective contracts with Guam related to their work on the closure of Ordot Dump and award Guam its damages suffered as a result of Defendants' breach;

184.    Enter a judgment in favor of Guam and against Brown & Caldwell, Black Construction, and GHD that they breached warranties owed to Guam related to their work on the

43

closure of Ordot Dump and award Guam its damages suffered as a result of Defendants failing to meet the obligations of the warranties they made to Guam;

185.    Enter a judgment in favor of Guam and against Brown & Caldwell, Black Construction, GHD, and Geo-Logic that they acted negligently in performing their professional work with regard to the closure of the Ordot Dump and award Guam its damages suffered as result of Defendants' negligence;

186.    Enter a judgment in favor of Guam and against Defendants Brown & Caldwell pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for environmental response costs incurred by Guam at the Ordot Landfill, plus interest, in an amount to be proven at trial;

187.    Enter a declaratory judgment of liability in favor of Guam and against Defendants Brown & Caldwell for future response costs pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2);

188.    Enter a judgement awarding Guam its costs incurred herein, including investigation costs, expert costs, attorneys' fees, prejudgment and post-judgment interest, to the full extent permitted by statute and/or other law; and

189.    Enter a judgment for such other and further relief as the Court deems just and equitable.

[signatures on next page]

44

Dated: the ___6th___ day of May, 2024


FOR GOVERNMENT OF GUAM:

OFFICE OF THE ATTORNEY GENERAL
DOUGLAS MOYLAN,
Attorney General of Guam
590 South Marine Corps Drive
ITC Building, Suite 802
Tamuning, Guam 96913

Bill Jackson*
John D.S. Gilmour*
Lauren H. Shah*
Kelley Drye & Warren LLP
515 Post Oak Blvd., Suite 900
Houston, Texas 77027


Graham Botha
Deputy Attorney General
Office of the Attorney General


*Attorneys for the Government of Guam*
* Pro Hac Vice Forthcoming

45